339 So.2d 425 (1976)
SOUTH-WEST UTILITIES, INC.
v.
SOUTH CENTRAL BELL TELEPHONE COMPANY et al.
No. 10786.
Court of Appeal of Louisiana, First Circuit.
September 20, 1976.
Rehearing Denied November 15, 1976.
Paul H. Due, Baton Rouge, of counsel, for South-West Utilities.
Victor A. Sachse, Baton Rouge, Herschel L. Abbott, Jr., New Orleans, of counsel for South Central Bell and Murray C. Fincher.
William Sneirson, New York City, of counsel for Western Elec. Co.
*426 Clarence M. Dunnaville, New York City, of counsel for Am. Tel. & Tel. Co.
Thomas W. Moore, Birmingham, Ronald W. Tweedel, James W. Hammett, New Orleans, of counsel for South Central Bell.
Before SARTAIN, CHIASSON and EDWARDS, JJ.
SARTAIN, Judge.
Plaintiff instituted this appeal from judgment of the trial court sustaining defendants' plea of prematurity directed at the jurisdiction of the court to entertain plaintiff's claim without prior resort to the Louisiana Public Service Commission (hereinafter referred to as the Commission.) We reverse for reasons stated herein.
The petition filed by plaintiff Southwest Utilities initiating this action shows plaintiff to be an interconnect company engaged in the business of providing office communications equipment and service to persons in the State of Louisiana. This equipment is designed to be interconnected with the telecommunications network owned and operated by defendants, South Central Telephone Company and American Telephone & Telegraph Co.
Allegations contained in the petition aver that defendants, South Central, American Telephone & Telegraph Co., and Western Electric, a subsidiary of American Telephone & Telegraph which manufactures equipment in competition with that of plaintiff, ". . . engaged in and continued to engage in the practice of entering into contracts, agreements, conspiracies, and/or combinations in restraint of trade in the State of Louisiana and also of monopolization, attempts to monopolize and combinations and/or conspiracies to monopolize trade or commerce in the State of Louisiana, all in violation of the antitrust laws of the State of Louisiana as set forth in Revised Statutes, La.R.S. 51:121-122, which violations have resulted in injury to the public and to plaintiff in the conduct of its business." The alleged details of the above described activity may be summarized as follows: (a) Defendants have lowered prices at which their office communications equipment is offered while at the same time raising prices of other services to all customers, thereby eliminating competition with other companies that provide office communications equipment and at the same time recovering amounts by which it purportedly reduced the cost of certain equipment. Defendants allegedly accomplished this by raising line charges which all of its customers must pay, instituting variable service charges on the above mentioned equipment, and requiring the installation and payment of interface devices by interconnection customers, (b) Defendants had acted unfairly to discourage interconnection by maintaining a policy of delay, inconvenience and improper installation and/or maintenance of the above mentioned interface equipment and by representing to plaintiff's customers that equipment problems emanated from plaintiff's equipment when in fact it was defendants' own equipment from which problems originated. It is further alleged that defendants have promulgated through advertising and direct representation to potential customers of plaintiff that plaintiff would not remain in business and thus would not be able to service what it sells or furnishes to its customers, (c) Defendants have engaged in sham representations to regulatory agencies to obtain the institution of anticompetitive tariffs.
Plaintiffs allege that due to these practices by defendant it has been effectively precluded from most of the product market and has suffered severe economic injury to its business in excess of two and one-half million dollars. Plaintiff seeks treble damages pursuant to R.S. 51:137 in an amount of $7,879,914.00.
Defendant South Central Bell filed an exception of prematurity urging that the court was without jurisdiction to consider these matters in an initial determination. Defendant Bell argues that inasmuch as its rates and the quality of its services are the gravamen of plaintiff's complaints, such matters must first be referred to the Louisiana Public Service Commission under the *427 regulatory powers granted the Commission pursuant to Art. 4, § 21(B) of the Louisiana Constitution of 1974. Defendants, American Telephone & Telegraph Co., Western Electric and Murray Fincher, alleged vice president of defendant Bell, also filed similar exceptions noting therein that while they themselves were not regulated by the Commission defendant Bell was and therefore argued that action taken against them absent a determination made upon the rates and services of defendant Bell by the Commission would be premature.
The trial judge held in his written reasons for judgment that with the exception of allegations pertaining to unfair advertising the issue presented was the reasonableness and fairness of Bell's rates and charges that were approved and controlled by the Public Service Commission. He concluded that by virtue of Art. 6, Sec. 4 of the Constitution of 1921 and Art. 4, Sec. 21 of the Louisiana Constitution of 1974 exclusive original jurisdiction in matters where the issue presented is the propriety and reasonableness of rates and services is vested in the Public Service Commission. The court thus dismissed the complaint as to all allegations except that of unfair advertising which the court felt required no administrative expertise and which was not within the scope of the Commission's jurisdiction.
The question presented herein is the applicability vel non of the doctrine of primary jurisdiction. This doctrine has been described by the U.S. Supreme Court in Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), as
". . . a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."
342 U.S. 570, 574-575, 72 S.Ct. 494.
It is said by one author to be a determination of who shall make the initial finding where two potential jurisdictions exist. Davis, Administrative Law Test, 3rd Ed., 1972, Chap. 19, Sec. 1901 at p. 373. The doctrine is not to be confused with the concept of "exhaustion of administrative remedies" which covers the procedural point at which judicial review may be sought on administrative decisions. One author draws the distinction as follows:
"In all [situations where the application of primary jurisdiction is relevant] there is at some point a claim enforceable by original judicial action, that is to say, a claim which in whole or in part is tried and enforced by judicial action. It is this that distinguishes the doctrine from the doctrine which demands exhaustion of administrative remedies before seeking judicial interference. In the exhaustion situation the claim is enforceable by administrative action alone; the judiciary is being invoked to correct or quash the administrative action. The exhaustion doctrine where applicable forbids judicial supervision of the administrative process until the latter has been exhausted."
Jaffe, "Primary Jurisdiction Reconsidered. The Antitrust Laws." 102 Univ. of Penn.Law Rev. 577, 579 (1954).
One of two major considerations undertaken by the courts in applying the doctrine of primary jurisdiction is the need for uniformity in various areas of regulated industry, particularly in the area of rates. In the case of Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 1907, the case to which has been attributed the inception of *428 the doctrine of primary jurisdiction,[1] the court confronted the situation presented by the Interstate Commerce Act which provided that shippers injured by unreasonable rates could pursue their claims before the I.C.C. or in the courts. In holding the agency to be the only proper initial forum in such disputes, in spite of the statute, the court stated:
". . . If, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission, and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal which the act created with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the Commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the Commission in the premises. This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court. In other words, the established schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."
204 U.S. 426, 440-441, 27 S.Ct. 355.
A second major factor comprising the doctrine of primary jurisdiction which the courts have considered is "special administrative expertise", attributed to the agencies due to their intimate working associations with the industries they regulate. The cornerstone of this consideration is found in Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922).
"Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such *429 acquaintance is commonly to be found only in a body of experts."
We readily concede that rates and services of the various regulated industries in this state are indeed the responsibility of the Louisiana Public Service Commission by virtue of Art. 4, Sec. 21 of the Louisiana Constitution of 1974 (and its prior counterpart, Art. 6, sec. 4 of the Constitution of 1921). Art. 4, sec. 21(B) states:
(B) Powers and Duties. The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law. (Emphasis ours)
It is specifically provided in R.S. 45:1163 that rates charged and services furnished by public utilities shall be regulated by the Public Service Commission.
§ 1163. Power to regulate rates and service
The commission shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities;. . .
We can easily appreciate in matters involving the determination of fair rates and services, in order that regulated industries may reasonably prosper and expand without taking undue advantage of monopolistic situations, that the Public Service Commission is eminently more qualified to make such decisions in contrast to the courts. This is necessarily so due to the integral association that this Commission has with these industries and the resulting inevitable familiarity with the specific and unique problems such industries encounter. It would indeed be an inefficient use of the courts and the Commission not to have the benefit of the Commission's expertise in such instances. Furthermore, the need for uniformity of rates dictates by the very essence of its nature a result that could not be otherwise.
However, in the present case we do not view plaintiff's efforts as an attempt to litigate rates and services. These factors, we feel, speak for themselves. Rather, plaintiff is here seeking to determine incidents of agreements and conspiracy to monopolize and restrain trade in specific contravention of our laws. These matters may in part be evidenced by particular rates, but by no means will rates alone be the sole criteria upon which such allegations will stand proved. The total context of such a suit in which rates may be involved to some extent does not seem to us to form matters traditionally passed upon by the Public Service Commission and therefore are not matters in which any expertise has been developed, or matters upon which the concept of uniformity has any bearing.
Moreover, we find no authority in favor of the Commission to immunize the regulated industry herein from answering for the specific violations alleged. We find persuasive on this point the Connecticut Supreme Court case of Mazzola v. Southern New England Telephone Co., 363 A.2d 170, cited to us by plaintiff involving similar facts and issues of law as those here presented.
In the Mazzola case plaintiff sought injunctive relief as well as money damages from defendant under the Connecticut Antitrust Act for defendant's wrongful termination of plaintiff's telephone service. This termination was based upon plaintiff's refusal to lease an interconnect device from defendant which defendant required to be used on answering mechanisms obtained from non telephone company sources. Plaintiff alleged that defendant's practices were "unlawful as they are for the purpose or for the effect of: (a) Fixing, controlling and maintaining prices, rates or quotations; (b) Refusing to deal or coercing, persuading or inducing third parties to refuse to deal with another person." Defendants argue that this matter should be submitted to the *430 Connecticut Public Utility Commission for determination.
The court examined the dispute to determine the role of primary jurisdiction and concluded that ". . . a court should generally refer an antitrust controversy to an appropriate agency in cases where action thereon by that agency will result in a determination of the defendant's liability under the antitrust laws." or ". . . where the agency is in an advantageous position to be of `material assistance' to the court by marshalling a crucial fact or facts, potentially determinative of the antitrust lawsuit, into a `meaningful pattern' . . . and a procedure exists empowering the antitrust plaintiff to raise the issue before the agency."
The court found that the statute conferring powers on the Commission granted no express authority to exempt the specific activity complained of from antitrust challenges nor did the fact that the Commission had the power to approve the rates amount to inherent immunization. The court noted that rates originated with the regulated industries and were simply submitted to the agency for approval. The court here pointed out that utilities were not required to submit with their proposals for rate increases any facts specifically designed to make out a sufficient showing that the proposal was necessary, such as to satisfy public need. Furthermore, the Commission itself was not under any obligation to conduct a fact finding inquiry of its own to determine if rates were reasonable or discriminatory. This was in the Commission's own discretion.
The court likewise found no implied immunity noting the absence of any "plain repugnancy" between the regulatory scheme and the antitrust law. The court stated on this point "The necessary repugnancy is sometimes found to be inherent in the fact, inter alia, that the regulatory scheme in question was enacted after the antitrust law in question went into effect (although such `repeals' of the antitrust laws are `strongly disfavored') . . . or where the agency is under a specific obligation to consider the potentially anticompetitive effects of a practice proposed by an organization subject to its regulatory powers before formally approving such practices as required [nevertheless] by the public interest . . .." The court found no plain repugnancy stating:
"In this case, the Public Service Companies Act provisions in question antedated the enactment of the Connecticut Anti-Trust Act, so that no `repeal' of the latter can be inferred therefrom. Moreover, the PUC has no obligation under the Public Service Companies Act to take into account the possibly anticompetitive effects of proposed tariffs filed with the Commission prior to granting its approval. Rather, whether the PUC decides to approve or modify a tariff pursuant to the provisions of § 16-19 upon a finding that any `rate' is `unreasonably discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity, and welfare,' or that a `service' is `inadequate or excessive,' is wholly within its discretion."
Likewise, the court found no way that one in plaintiff's position could raise before the Commission any of the "critical factual questions" potentially within the Commission's competence, such as "whether the activities of the telephone company challenged in this case are so essential to the public interest as to override any possible anticompetitive effects on the communications industry in the private sector of the economy, or whether the privately obtained device secured by the plaintiff would in some way be harmful to defendant's network." Rather, rates could merely be attacked as unreasonable and services as inadequate.
The court thus concluded that since it found neither statutory nor implied authority on the part of the Commission to immunize the alleged activities from antitrust challenges, and since it did not find a procedural mechanism through which plaintiff could raise before the Commission the kind of factual issues whose determination *431 would be of crucial importance to the court in its resolution of the antitrust controversy, the lower court erred in involving the doctrine of primary jurisdiction in deference to the agency.
In the present case, we likewise find no authority in favor of the Commission to immunize defendant from antitrust challenges against the specific activity alleged herein. The statutory scheme in this state provides no express authority to the Commission other than to fix and regulate rates charged and services furnished by the utilities. R.S. 45:1163.
Further, we find nothing in the statute which furnishes the Commission with implied authority to immunize such activity. We can not imply from the Commission's power to regulate rates and services that it must take into account the anticompetitive effects of proposals submitted to them. Rates and services which are "just and reasonable" and which therefore may appear to be in the best interest of the public may still form part of an overall scheme violative of the antitrust laws insofar as it comprises any agreement, attempt, or conspiracy to restrain and/or monopolize trade. To hold that approved rates and services are immune from antitrust challenges by implication is to likewise hold that antitrust laws by implication are repealed with respect to said rates and services. Repeals by implication are not favored in law and statutes which could arguably conflict must be read where possible to uphold the validity of each. Chappuis v. Reggie, 222 La. 35, 62 So.2d 92 (1953).
Thus on the basis of the allegations herein we conclude primary jurisdiction is not applicable. We have stated that, in our opinion, the concepts of uniformity and special administrative competence do not reflect to any significant degree on this dispute, as the particular matters alleged herein have no extensive past exposure before the Commission. Further, we have concluded that the Commission has no authority, even by its power to approve rates, to shield a regulated industry from antitrust challenges founded on the specific allegations herein.
We note that our opinion is based on allegations contained in plaintiff's petition which place this matter in the context of an antitrust suit. If it should later develop, however, that this is not the case, but rather, merely an attempt to avoid the Public Service Commission and divert from that agency matters which properly belong before it, then what we have stated herein would have no application.
Accordingly, for the above and foregoing reason, the judgment of the district court is reversed and set aside, and the matter is hereby remanded to the district court for proceedings consistent with the views expressed herein. All costs of this appeal are taxed to defendants. All other costs are to await a final disposition of the suit.
REVERSED AND REMANDED.
NOTES
[1] See von Mehren, "The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction", 67 Harvard Law Review 929, 932 (1954); Schwartz, "Legal Restrictions of Competition on the Regulated Industries: An Abdiction of Judicial Responsibility", 67 Harvard Law Review 436, 646 (1964); Stokes, "A Few Irreverent Comments About Antitrust, Agency Regulation, and Primary Jurisdiction", 33 G. Washington Law Review 529, 551 (1964); Jaffe, "Primary Jurisdiction", 77 Harvard Law Review 1037, 1042 (1964).